IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ACACIA C., | |
| Plaintiff, | 8:20-CV-96 |
| vs. | MEMORANDUM AND ORDER |
| ANDREW M. SAUL, Commissioner of the Social Security Administration, | |
| Defendant. | |

The plaintiff, Acacia C., filed her complaint (filing 1) seeking judicial review from the Commissioner's denial of her application for Title II disability insurance benefits, and moved this Court for an order reversing the Commissioner's final decision. Filing 11. The Commissioner filed his motion to affirm the agency's final decision denying benefits. Filing 15. The Court finds that the Commissioner's decision is not supported by substantial evidence on the record, that the plaintiff's motion to reverse should be granted, and that the Commissioner's motion to affirm should be denied.

## I. FACTUAL BACKGROUND

### 1. MEDICAL AND WORK HISTORY

The plaintiff is a resident of Lincoln, Nebraska, married, and she and her husband have three teenaged children. Filing 9-2 at 36. She was employed by the Nebraska State Auditor from February 2007 until her employment was terminated on June 10, 2016. Filing 9-6 at 4; filing 9-5 at 16. At the time of her dismissal, her job title was Auditor in Charge, and her monthly salary was $5,200.00. Filing 9-6 at 17. The letter informing her that her employment had been terminated did not provide a reason for her dismissal. Filing 9-5 at 16.

The plaintiff attributed her termination to her inability to maintain consistent work due to her illnesses. Filing 9-6 at 23. She testified that fatigue was the worst of the symptoms that prevented her from doing her job. Filing 9-2 at 38. If she was able to get up and go to work, by the end of the day she would be exhausted, and have to go to bed when she got home. She would often have to leave work halfway through the day, and ended up missing about two or three days a week from just being too tired and unable to function. *Id*.

At the time her employment was terminated, the plaintiff had used up all available sick leave and vacation time, and was only being paid for the days she could actually work. She reported that her final paycheck was only $300.00. Her earnings for 2016 indicate that she received approximately twenty percent less than what would be expected for an employee earning a base monthly salary of $5,200. Filing 9-5 at 6-7.

The medical records indicate that the plaintiff first sought evaluation and treatment for persistent headaches sometime before April 20, 2015. Her primary care physician, Anthony Dresbach, M.D., referred her to neurologist Dr. David Franco, who reported that on April 20, an MRI of the plaintiff's brain was abnormal, showing features consistent with demyelinating disease, but she did not have a history clearly supportive of multiple sclerosis. Filing 9-7 at 86. Dr. Franco saw the plaintiff again on July 17, this time for complaints of right upper extremity paresthesia and neck pain. The plaintiff told Dr. Franco that whenever she looked down or brought her chin to her chest, pain and a numbness sensation would immediately travel down one arm.

She told Dr. Franco that her symptoms had gradually increased in severity to where she now experienced persistent pain that was almost unbearable. *Id*. An MRI of her brain and cervical spine was obtained, which showed that the demyelination observed in July was unchanged. But now, her

cervical spine showed an area of hyperintensity within the right cervical spinal cord at C3-4, which was consistent with her symptoms. *Id.* Dr. Franco advised the plaintiff that these findings were highly suggestive of multiple sclerosis, and started her on a course of IV Solu-Medrol (methylprednisolone sodium succinate—a steroid) for symptom relief, as well as to treat her underlying etiology. Filing 9-7 at 87. Dr. Franco also ordered a lumbar puncture to confirm his suspicion of multiple sclerosis, and prescribed Gabapentin and Hydrocodone to assist with the control of her pain symptoms. The plaintiff received the IV infusions of Solu-Medrol on five consecutive days at Methodist Hospital in Omaha beginning July 20. Filing 9-7 at 7-8. On the fifth day, July 24, a lumbar puncture was performed. Filing 9-7 at 10-16. The results from the lumbar puncture supported a diagnosis of multiple sclerosis. Filing 9-7 at 78.

The plaintiff returned to see Dr. Franco on September 3, 2015. Dr. Franco reported that her headaches, which had been incapacitating at a 9 out of 10, had improved to about 6 or 7 out of 10. Her headaches were worse with bending or straining, but would improve when she lays down. Filing 9-7 at 74. Dr. Franco noted that the plaintiff's neck pain was improved, although she continued to have right arm and occasional lower extremity paresthesia. He also noted that her habitus is tall (the plaintiff is 5'11"), and her fingers were long and slender. Dr. Franco was concerned about the persistence of the plaintiff's headaches, and whether further investigations would need to be pursued. Filing 9-7 at 75. On September 29, the plaintiff called Dr. Franco reporting persistent, and even worsening upper extremity paresthesia in both hands, as well as a sense of imbalance. Filing 9-7 at 73. She reported falling on a couple occasions. Previously, at her September 3 examination, Dr. Franco reported observing slight instability on tandem gait. In response to these new,

3

continuing, and even worsening symptoms, Dr. Franco ordered a repeat course of prednisone.

At her September 3 examination, Dr. Franco wanted to start the plaintiff on medication to treat the plaintiff's multiple sclerosis symptoms. He provided her with information on two such medications, Tecfidera and Copazone, and asked the plaintiff to get back to him on which one she would like to proceed with. Filing 9-7 at 75. The plaintiff chose Copaxone, but insurance coverage issues delayed implementation. Filing 9-7 at 73. When her insurer finally issued its approval the last week in October, the plaintiff began receiving Copaxone injections three times per week. Filing 9-7 at 71.

The plaintiff's next visit with Dr. Franco was on December 7, 2015. Filing 9-7 at 69. Dr. Franco reported that she was still struggling with left neck and shoulder pain as well as fatigue. She was tolerating the Copaxone well, with only some transient injection site reactions. Dr. Franco ordered an increase in Gabapentin to address her ongoing neuropathic pain symptoms, and recommended that she take a daily supplement of 2,000 IU of vitamin D3. Dr. Franco also reported that the plaintiff had a positive ANA[1] (1:320) and that she did have a history of longstanding nonspecific connective tissue disease symptoms.

Dr. Franco next examined the plaintiff on March 16, 2016. He identified the plaintiff's conditions that required ongoing care as relapsing-remitting multiple sclerosis and nonspecific connective tissue syndrome characterized by musculoskeletal pain and fatigue. Filing 9-7 at 58. Dr. Franco reported that the MRI study done the day before her examination showed entirely stable

---

[1] Antinuclear antibodies (ANA) in serum is a screening test for patients suspected of having connective tissue disease. ANA can occur in patients with a variety of autoimmune diseases. www.mayocliniclabs.com/test-catalog/Clinical+and+interpretive/65161.

findings compared to the studies done in July, and that her previously noted cervical cord lesion was reduced from five to three millimeters. The plaintiff, however, continued to struggle with left parascapular muscular pain, and some persistent neck pain stemming from her original cervical cord exacerbation. Dr. Franco identified that the plaintiff's current medications included Copaxone, Gabapentin (900 mg three time daily), Fluoxetine (20 mg every morning), and Tramadol as needed. He noted that the plaintiff benefited from Gabapentin for pain control and Fluoxetine for fatigue.

On May 24, the plaintiff called Dr. Franco to report that approximately a week before she developed a burning sensation if she turned her head to the right. Filing 9-7 at 57. She felt the sensation go down her right side and into both legs, lasting for a few seconds, and then go away. She reported that the symptoms occurred every time she turned her head to the right, but that she had no symptoms in between episodes. Dr. Franco made a couple suggestions regarding medication changes, one of which involved a series of steroid infusions. Dr. Franco also recommended obtaining an additional opinion from Dr. Rana Zabad at the Nebraska Medical Center to further clarify the plaintiff's connective tissue disease diagnosis and any relationship that diagnosis may have with her symptoms.

The plaintiff called Dr. Franco again on June 13 to report that she was still having the right-sided burning sensation symptoms when she turns her head, and now was also having left-sided neck pain with pain behind her left eye with some intermittent blurred vision. Filing 9-7 at 56. Dr. Franco brought up the possibility of a course of IV steroid infusions. The plaintiff reported that now, since she had lost her job, she would be able to proceed with a three to five-day course of IV Solu-Medrol, but would like to have it done in Lincoln, rather than in Omaha like before. Dr. Franco said he would work this out with

5

Dr. Dresbach's office. Filing 9-7 at 55. He also noted that the plaintiff had an appointment with Dr. Zabad scheduled for August 23. Filing 9-7 at 56. Dr. Dresbach's office was able to schedule the plaintiff for a four-day course of Solu-Medrol IV infusions beginning June 14. Filing 9-7 at 55; 99-102.

The plaintiff saw Dr. Rana Zabad on August 23, 2016, as scheduled. Dr. Zabad is an Associate Professor at the Nebraska Medical Center College of Medicine, and the Director of the Nebraska Medical Center Multiple Sclerosis Program. Filing 9-7 at 123. Dr. Zabad noted that the plaintiff's referral was to clarify her diagnosis and any relationship with the positive ANA or possible connective tissue disease. Filing 9-7 at 118. Regarding her recent treatment, Dr. Zabad reported that the plaintiff had received some symptomatic improvement from her four-day course of IV steroids in June. Dr. Zabad identified the plaintiff's other neurological symptoms, which included positive bladder hesitancy, positive diarrhea with incontinence, decreased memory and recall with problems finding words, physical activity limited by neck pain and her reported burning sensation symptoms, low energy, the capacity to sleep during the day but with problems falling asleep at night, pain behind the left eye, leg pain, and feeling unsteady and numbness in her feet after immobilization. Filing 9-7 at 118-19.

Dr. Zabad's impression was that the plaintiff had relapsing remitting multiple sclerosis with her first event occurring in 2005 when she experienced an episode of diplopia (double vision), a positive ANA that likely was a false positive, chronic diarrhea, significant fatigue, lightheadedness and dizziness, and chronic neuropathic pain related to her spinal cord disease. Filing 9-7 at 122. With respect to the plaintiff's lightheadedness and dizziness symptoms, Dr. Zabad referred her for an autonomic reflex screen.

6

That screen was performed by Dr. Ezequiel Piccione on August 30. Filing 9-7 at 123-24. The plaintiff described this evaluation as the "tilt table test." Filing 9-2 at 42. At first, she was lying flat on a table, and then gradually her head was tilted up. Her heart rate, blood pressure, and perspiration output were measured during the tilt up. The screening results showed, according to Dr. Piccione, an abnormal study. Filing 9-7 at 124. The plaintiff's heart rate response to the head-up tilt was deemed excessive, and she was symptomatic for dizziness. Dr. Piccione reported that the findings were suggestive of postural orthostatic tachycardia syndrome (POTS), and an associated distal small fiber neuropathy.

The plaintiff returned for a follow-up evaluation with Dr. Zabad on January 17, 2017. Filing 9-7 at 158. Dr. Zabad identified baseline symptoms of joint pain currently treated with 1,200 mg of Gabapentin three times per day, bladder hesitancy with rare leaks, diarrhea with incontinence, problems finding words and difficulty with recall, lightheadedness, dizziness, palpitations, low energy, and restless leg syndrome. Dr. Zabad reported that since her last evaluation, the plaintiff had undergone autonomic testing that was abnormal and supportive of POTS. She was currently wearing a heart monitor that indicted her heart rate was consistently above 120 upon standing, and with activity would further increase to 160 and up to 200, which, as Dr. Zabad noted, "wipes her out." *Id.* Dr. Zabad noted that the plaintiff was scheduled to see Dr. Piccione "this Friday."

Dr. Zabad also noted that since her last evaluation, the plaintiff was seen by pulmonary where she participated in a sleep study. The results of that study led to a diagnosis of moderate sleep apnea. Filing 9-7 at 158. Dr. Zabad reported that Gabapentin incompletely helped, but the plaintiff's pain control was acceptable. Filing 9-7 at 159. She continued to have pain beneath her left

shoulder blade, and her feet were cold all the time. Dr. Zabad noted that the plaintiff had significant fatigue, and her POTS diagnosis makes her tired all the time and exhausts her. Filing 9-7 at 162.

The plaintiff advised Dr. Zabad that her son had been diagnosed with an aortic root dilation and was being tested for Marfan syndrome.[2] Filing 9-7 at 159. The plaintiff said she was also going to be evaluated for Marfan syndrome and will undergo genetic testing and an echocardiogram. Dr. Zabad noted that POTS is associated with Ehlers-Danlos syndrome[3] and that the plaintiff's father is very tall, around 6'6," but has not been diagnosed with Ehlers-Danlos or Marfan syndrome. Filing 9-7 at 159.

The plaintiff's neurological consultation with Dr. Piccione was on January 20. Dr. Piccione confirmed his prior diagnosis of POTS. He reported that the heart rate monitor associated with the plaintiff's watch has shown heart rate increases in the 150-160 range when she is just doing laundry. Filing 9-7 at 164. At this examination, the plaintiff's resting pulse was 95. Filing 9-7 at 167. Dr. Piccione's treatment recommendations were for the plaintiff to increase her water and sodium intake, that she raise the head of her bed two to three inches, and that she wear thigh-high stockings. Filing 9-7 at 170. Dr. Piccione noted three medications that could be tried, one of which was Midodrine.

---

[2] Marfan syndrome is an inherited disorder that affects connective tissue. People with Marfan syndrome are usually tall with disproportionately long arms, legs, fingers, and toes. www.mayoclinic.org/diseases-conditions/marfan-syndrome/symptoms-causes/syc-20350782.

[3] Ehlers-Danlos syndrome is a group of inherited disorders that affect connective tissues. www.mayoclinic.org/diseases-conditions/ehlers-danlos-syndrome/symptoms-causes/syc-20362125.

On February 21, Dr. Angela Yetman evaluated the plaintiff regarding Marfan syndrome. Dr. Yetman suspected Marfan given the plaintiff's phenotypic features such as the fact that she is tall, she exhibits long, slender fingers (arachnodactyly), and has severe myopia, as well as long legs, joint laxity, and an abnormal wingspan to height ratio. Filing 9-7 at 146-47. An echocardiogram study obtained for the evaluation showed normal intracardiac structural anatomy, no chamber enlargement, ventricular dysfunction, or pathologic flow disturbances. Filing 9-7 at 149.

The plaintiff returned for a follow-up examination with Dr. Zabad on July 5, 2017. Dr. Zabad reviewed the plaintiff's echocardiogram and found some aortic root dilation, but not as severe as her son's condition. Dr. Zabad's assessment on this occasion was clinically definite multiple sclerosis, significant fatigue partially attributed to POTS, and chronic diarrhea. Filing 9-8 at 31. Regarding the plaintiff's POTS, Dr. Zabad reported that the plaintiff is currently being followed by Dr. Piccione, and was now taking Midodrine in addition to increasing salt and water intake and wearing compression stockings. Dr. Zabad reported that the plaintiff's ongoing chronic neuropathic pain continues to be treated with Gabapentin. Filing 9-8 at 28. Previously, Dr. Zabad noted the plaintiff's neuropathic pain symptoms would benefit from some exercise. Filing 9-7 at 122. At this July 5 evaluation, the plaintiff reported that she walks three to four time per week, but she does not exercise other than the walking. Filing 9-8 at 28. Dr. Zabad attributed the plaintiff's inability to exercise more to her significant tachycardia. Filing 9-8 at 31.

On August 8, 2017, the plaintiff presented to the Bryan Hospital emergency room with complaints of left foot pain that had been bothering her for about three days. Filing 9-8 at 109. She reported that she had been attending a conference in Atlanta, and did quite a bit of walking. She developed

pain in the top of her left foot that was getting worse. Her pain was significant when weightbearing, but didn't bother her when she was at rest. Slight swelling to the top of her foot was observed, as was tenderness with palpation. An x-ray did not detect an acute fracture or stress changes. Filing 9-8 at 108.

The plaintiff had a follow-up evaluation with Dr. Piccione on August 16. Filing 9-8 37. Dr. Piccione reported that the plaintiff was still experiencing continued lightheadedness with standing that worsened with activity, which happened almost every day. Dr. Piccione noted that he had started the plaintiff on Midodrine at her last visit, but there had not been a significant change in her symptoms. His plan was to slowly increase her dosage, but if that didn't help, to consider a different medication. Dr. Piccione reported that the plaintiff's POTS symptoms were significant. Filing 9-8 at 43. The report from this evaluation did not mention the plaintiff's foot pain.

However, the plaintiff's left foot pain had not resolved. On August 17, she visited her primary care physician, Dr. Dresbach. Filing 9-8 at 94. Dr. Dresbach reported that the plaintiff was continuing to experience pain on the top of her left foot, which resulted from walking more than usual while attending a conference in Georgia. She returned to see Dr. Dresbach on September 13 complaining of constant left foot pain. Filing 9-8 at 91. Dr. Dresbach provided the plaintiff with more analgesic patches, and x-rays of the plaintiff's left foot were repeated. On September 18, the plaintiff was referred to orthopedic surgeon Dr. Jason Weber, who determined that she had a stress fracture of her left second metatarsal. Filing 9-8 at 82. Dr. Weber placed the plaintiff in a short boot for four weeks, after which she was to start weaning out of it. When she returned to see Dr. Weber on November 2, her stress fracture had resolved. Filing 9-8 at 77.

The plaintiff returned for a follow-up examination with Dr. Zabad on December 13. Filing 9-8 at 44. Much of Dr. Zabad's assessment of the plaintiff had not changed. She had clinically definite multiple sclerosis, significant fatigue, POTS which prevented her from exercising due to tachycardia, neuropathic pain that was being treated with Gabapentin, and Marfan syndrome with evidence of aortic root dilation. Filing 9-8 at 48-49. Dr. Zabad started the plaintiff on Nuvigil in an attempt to give her more energy.

The plaintiff's next follow-up appointment was with Dr. Piccione on February 21, 2018. Filing 9-8 at 50. Regarding her POTS symptoms, Dr. Piccione reported that her medication, Midodrine, was providing some improvement, but she continued to experience feeling like she may faint (presyncope) two to three time per week, and worsening of lightheadedness symptoms, as well as possible palpitations and sweating with activity. Although noted to be an improvement, Dr. Piccione, nonetheless, characterized the plaintiff's POTS symptoms as significant and increased her Midodrine dose. Filing 9-8 at 56.

On May 29, the plaintiff was seen for a follow-up examination by Rebekkah Thomas, an Advanced Practice Registered Nurse in Dr. Zabad's Multiple Sclerosis Program. Filing 9-8 at 115. Thomas reported that the plaintiff said she was feeling well and had not noticed any new neurological symptoms. Filing 9-8 at 116. However, regarding her existing symptoms, the plaintiff reported that she noticed a slight progression in those symptoms, including her fatigue, mental fog, left side paresthesia, and neuropathic pain. Filing 9-8 at 116. The plaintiff said that her mental fog was more noticeable than before, and that her main problem was with verbalizing what she was thinking. The plaintiff said that she has noticed some problems with insomnia after starting Nuvigil, which Dr. Zabad had prescribed at her last visit. She

11

said it feels like she is on a high for 24 hours and then hits a low. Thomas noted that the plaintiff's fatigue is likely multifactorial in relation to both her multiple sclerosis and POTS, and complicated by the plaintiff's obstructive sleep apnea and restless leg syndrome. Filing 9-8 at 119.

The plaintiff's counsel sent a letter, dated August 14, 2018, to Thomas asking her to respond to six specific questions, which were primarily concerned with the plaintiff's capacity to perform work. Filing 9-8 at 131-32. Short responses to the questions were handwritten on the letter, presumably by Thomas, but the letter with the responses was returned unsigned. In a report on Nebraska Medicine letterhead dated August 30, Thomas followed up the handwritten responses on counsel's August 14 letter, with a more detailed narrative of the plaintiff's condition and capacity. Filing 9-8 at 135-36.

Thomas opined that the plaintiff displays signs of muscle fatigability with stress testing which might impair her ability to stand or ambulate for long periods. Thomas believed the plaintiff should be limited to a maximum of standing for two hours combined in an eight-hour day. Filing 9-8 at 135. Thomas outlined that the plaintiff's chronic fatigue was multifactorial, and complicated by factors such as heat sensitivity and physical activity. Thomas reported that the plaintiff's Gabapentin dose was the maximum dosing regimen of 3,600 mg daily, and that one of the most common side effects of Gabapentin is sedation. Thomas believed that the plaintiff could benefit from a rest period of one hour per day to alleviate her fatigue. She also thought that it was likely that the plaintiff would miss two or more days of work in a month due to multiple sclerosis. Filing 9-8 at 136.

The plaintiff participated in a functional capacity evaluation at Horizon Rehabilitation Center on Dr. Zabad's referral. Filing 9-8 at 139. The evaluation was performed over two days, September 13 and 14, by physical therapist

Tammy Roehrs. The first session lasted four hours, and the second forty-five minutes. The evaluation was described as a modified FCE format, which was being utilized to better understand the impact that multiple sclerosis was having on the plaintiff's functional abilities. *Id*. Roehrs is credentialed with a neurologic specialist certification (NSC).

Roehrs documented the plaintiff's reported daily activities. Filing 9-8 at 140. The plaintiff said that fatigue affected her ability to complete home care tasks such as laundry, washing dishes, showering, and grocery shopping. Her husband and children have to complete homemaking tasks. She had groceries delivered and her husband and children put the groceries away. She must plan ahead and rest several days in advance to attend her children's activities, but ends up missing many of those activities due to fatigue. She has a sense of tunnel vision and feeling faint, which can occur three to four time a day, and which she manages by lying down. She finds herself napping two to three times a day. On days when her symptoms are mild, she feels like her head is in a vice. The plaintiff described having difficulties with her memory, losing her train of thought, and difficulty finding words. *Id*.

The systems Roehrs' examination tested included the plaintiff's physical impairments, her functional mobility, endurance, and dynamic lifting. The tasks performed included floor to waist lifting, gait and walking, walking while carrying weight, balance, grip strength, flexibility, and coordination. Filing 9-8 at 140-44. Roehrs concluded that the plaintiff gave a full and valid effort during the evaluation, and completed all tasks as requested. Filing 9-8 at 144. The plaintiff was found to have diminished grip strength with fatigue at the end of both days. Roehrs concluded that the plaintiff would struggle to meet the demands for hand strength and fine motor control for typing and desk work encountered by an auditor. Roehrs found that the plaintiff's reported levels of

perceived fatigue and dizziness correlated with objective evidence of fatigue and imbalance during the examination. Filing 9-8 at 145.

The plaintiff's ability to perform functional mobility activities such as walking, crouching, and repeated sit-to-stand were also influenced by fatigue. Roehrs reported that during a typical five-day work week, the plaintiff's fatigue may compound from one day to the next, and have a profound impact on mobility when considering a full week. Filing 9-8 at 145. Roehrs concluded that the plaintiff's need for frequent rest breaks to manage her blood pressure and heart rate make it unlikely that she could meet productivity expectations of an employer, and her level of fatigue would prevent her from returning to work as an auditor, as well as make it difficult for her to complete training for an alternate vocation.

## 2. ADMINISTRATIVE HEARING

A hearing before an Administrative Law Judge (ALJ) was held on September 10, 2018, in which the plaintiff and a vocational expert were the only witnesses.[4] Filing 9-2 at 34-50. The vocational expert was not present at the hearing, but testified by telephone conference. Filing 9-2 at 46. The hearing opened with plaintiff's counsel alerting the ALJ to the fact that the plaintiff had not yet participated in her functional capacity evaluation with Roehrs,

---

[4] The quality of the hearing transcript is poor. The ALJ, Kelly Humphrey, is identified as Kelly Cuddigan, which is the last name of plaintiff's counsel. Further, the transcription does not have questions and the responsive answers beginning on separate lines. Instead, the questions and answers appear comingled in paragraphs. Counsel, however, has not alerted the Court to errors in, or concerns about whether the testimony was accurately transcribed, notwithstanding the unconventional form of the transcription and the ALJ's misidentification.

14

which was scheduled for September 13, and asked to have the evidentiary record held open for two weeks so that Roehrs' evaluation and report could be added to the record. Filing 9-2 at 35. Plaintiff's counsel identified the plaintiff's two primary medical conditions—multiple sclerosis and POTS—and that these two conditions create a great deal of fatigue. Filing 9-2 at 37-38.

The ALJ began by inquiring about the plaintiff's family (married with three children age 11 to 15), her education (a college graduate), and her last job with the State Auditor. The plaintiff said that her auditor duties included going over financial records and receipts from different agencies, writing reports and providing those reports to agencies, meeting with co-workers, discussing audits, examining physical assets, and "just audit procedures." Filing 9-2 at 37-38. The plaintiff said she held her job with the State Auditor for nine and a half years, and was terminated in June 2016 for missing too much work. Filing 9-2 at 38.

The ALJ then turned the examination over to plaintiff's counsel, who asked the plaintiff about her various medical conditions, her diagnosis, the treatments she is receiving, and the affects her conditions and treatment have on her capacity to function. Filing 9-2 at 37-45. The plaintiff said that she was first diagnosed with multiple sclerosis in July 2015 by Dr. Franco. Filing 9-2 at 37. At that time, her symptoms were neck and left side pain and weakness. The steroid treatment she received at that time helped reduce her pain. Filing 9-2 at 38. Counsel next asked the plaintiff about her symptoms in the spring of 2016, just before she lost her job. The plaintiff said fatigue was the worst symptom—not being able to get up and function. When she could go to work and do her job, she would be so tired when she got home, she would just go to sleep right away. Eventually, she was missing two to three days a week from

15

just being tired and unable to function, or have to leave work halfway through the day.

The plaintiff said that at the time Dr. Franco referred her to Dr. Zabad, in addition to her existing symptoms of fatigue and neck and left side pain, she was also having dizzy spells and not able to stand up without feeling like she was going to faint. Filing 9-2 at 39. The plaintiff said that her current symptoms include fatigue, and constant neck and left side pain. Gabapentin only lessens her pain from eight or nine out of ten, to four or five. She experiences numbness and tingling in her legs, and numbness and weakness in her left arm. She continues to suffer bladder and bowel incontinence. Regarding cognition, the plaintiff said she experiences confusion, has trouble completing a sentence or finishing a conversation, she will make wrong turns while driving her kids to school, and just forget things. Filing 9-2 at 40.

The plaintiff said fatigue made taking a shower difficult—just getting up and moving was difficult. She sleeps most of the day. She attributed her lightheadedness and dizziness to POTS, and described the objective diagnostic testing she went through. In describing her symptoms, she said that when she is lying down and sits up, she gets dizzy. If she doesn't wait to stand, she gets tunnel vision, hears a ringing sound, and feels like she will faint. Filing 9-2 at 41. She is drenched in sweat, her heart will be racing, and feels like she ran a marathon from doing laundry, or loading and unloading the dishwasher. Her POTS symptoms will occur three or four times a day. The plaintiff described her Marfan condition and agreed that it was a condition that did not require immediate medical treatment, but just a condition that required monitoring. Filing 9-2 at 42. She believed that Marfan and POTS both affect her ability to pump blood, and combine to cause her fatigue. She wears compression stockings to help keep pressure in her legs and help pump blood.

16

Regarding household chores, the plaintiff said her husband and children have to do most of it. She said grocery shopping is difficult because she has to stand for so long, so she has groceries delivered. When groceries are delivered, she has help unpacking them. Filing 9-2 at 44. She said she only leaves the house to take her kids to school and pick them up after school. She said she could only stand for ten to fifteen minutes at a time, and gets tired and her legs get a little numb with sitting. She said she could only sit for maybe two hours. When asked what her biggest problem was in terms of daily activities, she said being tired all the time, just feeling exhausted, and needing to sleep just to function for a couple hours when she's awake. Filing 9-2 at 45.

The ALJ asked about the reference in the medical records concerning the conference she attended in Atlanta where she did "quite a bit of walking" and developed pain in her foot. The plaintiff said she, her husband, their fourteen-year-old daughter, and youngest son who was diagnosed with Marfan syndrome, were attending a Marfan conference, and there wasn't a whole lot of transportation available. They had to walk, but they stopped and sat down many times so she could rest. She agreed that she walked, but not for extended periods. The plaintiff said they drove to Atlanta, and also drove to Boston on another occasion for a family wedding, but those were the only two occasions that she has traveled. Filing 9-2 at 46.

The ALJ next turned to the vocational expert. After asking the vocational expert to classify the plaintiff's past work, the ALJ asked the vocational expert to assume the following hypothetical.

> And if you could, assume a hypothetical individual the same age, education, and past work as the claimant with the residual functional capacity to perform work at the sedentary level. She can occasionally climb ramps and stairs, ladders, ropes, and scaffolds,

17

balance, stoop, kneel, crouch, and crawl. She must avoid more than occasional exposure to extreme cold, extreme heat, concentrated wetness, vibration, and cannot tolerate exposure to hazards such as moving mechanical parts and high exposed places.

Filing 9-2 at 46-47.

The ALJ asked if this hypothetical individual could perform the plaintiff's past work, and the vocational expert said "Yes, they could." Filing 9-2 at 47. The ALJ then added a limitation to the hypothetical "that the individual could understand, remember, and carry out simple instructions," and asked whether this amended hypothetical individual could perform the plaintiff's past work. The answer was "No, they could not." The vocational expert was asked if there would be work in the national economy for this amended hypothetical individual, and the vocational expert identified three vocations: (1) Account clerk, DOT 205.367-014, sedentary, SVP 2, national employment statistics are 14,860; (2) Call out operator, DOT 237.367-014, sedentary, SVP 2, national employment statistics are 17,220; (3) Addresser, DOT 209.587-010, sedentary, SVP 2, national employment statistics are 17,250.

Finally, the ALJ added another limitation—that the individual would miss work on an unscheduled basis two time per month—and asked what effect that would have on the individual's ability to do the jobs the vocational expert previously cited. The vocational expert said if the individual were consistently missing two days per month, she would be unable to sustain employment. Plaintiff's counsel then asked, if the hypothetical individual needed to rest one hour per day, would that person be able to perform the jobs that had been identified. The vocational expert said "No, they would not," and further agreed that such person would not be able to perform any competitive employment.

### 3. ALJ's FINDINGS AND CONCLUSIONS

On February 8, 2019, the ALJ issued an unfavorable decision, finding that the plaintiff was not disabled. Filing 9-2 at 8. To determine whether a claimant qualifies for disability benefits, an ALJ performs a five-step sequential analysis of the claim. 20 C.F.R. § 404.1520(a)(4). Regarding step one, the ALJ found that the plaintiff met the insured status requirement of the Social Security Act through December 31, 2021, and that the plaintiff had not engaged in substantial gainful activity since June 10, 2016, the plaintiff's alleged onset date. Filing 9-2 at 12.

At step two, the medical severity of the claimant's impairment is considered. 20 C.F.R. § 404.1520(a)(4)(ii). The claimant has the burden to prove a medically determinable physical or mental impairment or combination of impairments that significantly limits the physical or mental ability to perform basic work activity. *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006). The ALJ found the following severe impairments: relapsing-remitting multiple sclerosis, postural orthostatic tachycardia syndrome with recurrent arrhythmias and migraines, Marfan syndrome, obstructive sleep apnea, and restless leg syndrome. The ALJ found that the plaintiff's obesity and fractured left toe were non-severe and caused no symptoms or limitations. Filing 9-2 at 13.

At step three, the medical severity of the claimant's impairments is considered. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments meet or equal a presumptively disabling impairment listed in the regulations, the analysis ends, and the claimant is automatically found disabled and entitled to benefits. *Gonzales,* 465 F.3d at 894. The ALJ found that the plaintiff tachycardia and arrhythmia did not meet or equal listing 4.05, recurrent

19

arrhythmias. The evidence did not indicate recurrent arrhythmias resulting in uncontrolled, recurrent episodes of cardiac syncope or near syncope, despite prescribed treatment, and documented by appropriate medically acceptable testing. Filing 9-2 at 13. Regarding the plaintiff's multiple sclerosis, the ALJ concluded that her condition did not meet or medically equal listing 11.09, multiple sclerosis. The evidence did not demonstrate that the plaintiff has disorganized motor function in two extremities, resulting in extreme limitations. The ALJ also found that the plaintiff's migraines do not meet any listing because no listing directly addresses headaches or migraines. Further, the ALJ concluded that the evidence did not show that the plaintiff's headaches reached a level of severity warranting an equaling of any other listing, especially under listing 11.00, neurological impairments.

At step four, a claimant has the burden to prove the lack of a residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *Gonzales,* 465 F.3d at 894. The ALJ found that the plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a), except she can only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. She must avoid more than occasional exposure to extreme cold, extreme heat, concentrated wetness, and vibrations. The plaintiff cannot tolerate exposure to hazards such as moving mechanical parts and high, exposed places. She can understand, remember, and carry out simple instructions. Filing 9-2 at 13.

In reaching her residual functional capacity finding, the ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the ALJ believed that the plaintiff's statements concerning intensity, persistence, and the limiting effects of her symptoms are not entirely consistent with the medical and other

evidence in the record. Filing 9-2 at 15. Further, the ALJ only gave partial weight to Rebekkah Thomas' report regarding the plaintiff's condition, and only partial weight to Tammy Roehrs' functional capacity evaluation report. Filing 9-2 at 17-18. In contrast, the ALJ gave great weight to the opinions of the state agency medical consultants. Filing 9-2 at 18.

The ALJ determined that the plaintiff was unable to perform her past relevant work as an auditor, either as actually, or as generally performed. Filing 9-2 at 19. In making this determination, the ALJ relied on the vocational expert's testimony and opinion, which was in response to the ALJ's second, or amended, hypothetical. That second or amended hypothetical is consistent with the ALJ's step four residual functional capacity finding.

At step five, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform considering the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); *Gonzales,* 465 F.3d at 894. The ALJ accepted the vocational expert's testimony regarding jobs in the national economy that the plaintiff could perform given her age, education, work experience, and residual functional capacity. Further, the ALJ reported that pursuant to SSR 00-4p, she has determined that the vocational expert's testimony regarding jobs the plaintiff could perform in the national economy was consistent with the information contained in the Dictionary of Occupational Titles. Filing 9-2 at 20. Accordingly, the ALJ determined that the plaintiff has not been under a disability as defined in the Social Security Act from June 10, 2016 through the date of the ALJ's decision.

On April 3, 2019, the plaintiff requested Appeals Council review of the ALJ's February 8, 2019, decision. Filing 9-4 at 65-68. On January 13, 2020, the Appeals Counsel notified the plaintiff that it had denied her request for review.

Filing 9-2 at 1-4. The ALJ's February 8, 2019, decision is now the final administrative order.

## II. STANDARD OF REVIEW

This Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." *Combs v. Berryhill*, 878 F.3d 642, 645-46 (8th Cir. 2017). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." *Id.* The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." *Id.* The Court will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue,* 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court defers to the ALJ's determinations regarding credibility so long as such determinations are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

## III. DISCUSSION

### 1. SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE ALJ'S FINDING THAT THE PLAINTIFF CAN PERFORM JOBS IN THE NATIONAL ECONOMY

Social Security Ruling 00-4p provides that before relying on a vocational expert's evidence to support a disability determination or decision, an ALJ must identify and obtain a reasonable explanation for any conflicts between the occupation evidence provided by the expert and information in the

Dictionary of Occupational Titles (DOT). The ALJ must explain in the determination or decision how any such conflict was resolved.

A disability determination is not an adversarial process, and the ALJ has a duty to fully and fairly develop the record supporting her determination. *Noerper v. Saul*, 964 F.3d 738, 747 (8th Cir. 2020); *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). The ALJ has an affirmative duty to ask about any possible conflict between the vocational expert's testimony and the DOT regarding the requirements of a job before relying on the vocational expert's opinion to deny a claim. *Kemp ex rel. Kemp v. Colvin,* 743 F.3d 630, 632 (8th Cir. 2014). If there is an apparent conflict between a vocational expert's testimony and the DOT, the ALJ must resolve it by eliciting a reasonable explanation for the conflict, and determine whether the explanation provides a basis for relying on the vocational expert's opinion rather than on the DOT. *Moore v. Colvin*, 769 F.3d 987 (8th Cir. 2014). If the conflict is not resolved, the vocational expert's testimony does not constitute substantial evidence supporting a denial of benefits. *Stanton v. Comm'r, Soc. Sec. Admin.*, 899 F.3d 555, 558 (8th Cir. 2018).

In determining whether there were jobs the plaintiff could perform in the national economy, the ALJ had the vocational expert assume a hypothetical individual limited to jobs that only required such person to understand, remember, and carry out simple instructions. Filing 9-2 at 47. The ALJ incorporated this same limitation into her residual functional capacity finding, and relied upon it in determining that other jobs existed in the national economy for the plaintiff. Filing 9-2 at 20. Those jobs were: (1) charge account clerk (DOT 205.367-014), (2) call out operator (DOT 237.367-014), and (3) addresser (DOT 209.587-010).

The ALJ specifically noted that she had a duty to determine, and had determined, that the vocational expert's testimony was consistent with the information in the Dictionary of Occupational Titles. Filing 9-2 at 20. The ALJ did not provide any detail discussing or explaining the inquiry she made outside of the hearing to actually determine that the expert's testimony was consistent with the information in the DOT. Further, at the hearing, the only inquiry the ALJ made to determine whether the expert's testimony was consistent with the DOT was the following.

> Q:   And was your testimony today consistent with the information found in the DOT?"
>
> A:   Given the DOT does not address absences or off task time, additional breaks, I'm basing that on my experience.

Filing 9-2 at 48.

The occupations listed in the DOT identify and classify vocational components, such as strength, general education development, and specific vocational preparation (*see e.g.* Dictionary of Occupational Titles 713.684-038, 1991 WL 679267 (2016)), that are deemed to be the approximate maximum requirements for performance of the listed occupations. *Jones v. Chater,* 72 F.3d 81, 82 (8th Cir. 1995). The general educational development component (GED Scale) "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." Dictionary of Occupational Titles, Appendix C, 1991 WL 688702 (2016). The GED Scale has three divisions: reasoning development, mathematical development, and language development. *Id.* Each occupation listed in the DOT is coded with a reasoning development level, which corresponds to the ability to follow instructions and the problem-solving skills required for satisfactory job performance. *Hulsey v. Astrue,* 622 F.3d 917, 923 (8th Cir. 2010).

24

The plaintiff correctly notes that the reasoning development levels of the occupations identified by the vocational expert are inconsistent with the ALJ's residual functional capacity determination that the plaintiff could only understand, remember, and carry out simple instructions. The addresser occupation identified by the vocational expert is coded at reasoning level 2. Reasoning level 2 work involves applying "commonsense understanding to carry out *detailed* but uninvolved written or oral instructions" and deal with "problems involving a few concrete variables in or from standardized situations." Dictionary of Occupational Titles, 209.587-010, 1991 WL 671797 (2016). The two other jobs identified by the vocational expert, charge account clerk and call-out operator, are coded at reasoning level 3—a more demanding reasoning level—which is defined as work that involves applying "commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form" and dealing "with problems involving several concrete variables in or from standardized situations." Dictionary of Occupational Titles, 205.367-014, 1991 WL 671715 (2016) & 237.367-014, 1991 WL 672186.

In contrast, jobs at reasoning level 1 involve applying "commonsense understanding to carry out *simple one-or-two step instructions*" and deal with "standardized situations with occasional or no variables in or from these situations encountered on the job." Dictionary of Occupational Titles, Appendix C, 1991 WL 688702 (2016). There is an apparent conflict in the vocational expert's testimony when she identified that an available occupation for the plaintiff was one that would require her to have the capacity to carry out *detailed* but uninvolved written or oral instructions, when the ALJ had determined that the plaintiff was suited for jobs that required her to only understand, remember, and carry out *simple instructions*. The conflict is even

25

more apparent when the two other jobs the vocational expert identified require an individual to have the capacity to apply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form, and deal with problems involving several concrete variables in or from standardized situations.

The Court finds that here, there is an apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Titles. The ALJ limited the plaintiff to jobs that required her to only understand, remember, and carry out *simple instructions*, but the occupations the vocational expert identified as suitable required the plaintiff to have the capacity to carry out *detailed* but uninvolved written or oral instructions, or to have the understanding to carry out instructions furnished in written, oral or diagrammatic form.

Such conflicts, if not resolved, are generally held to be reversible error. *See Stanton*, 899 F.3d at 558-59; *Thomas v. Berryhill*, 881 F.3d 672, 676-77 (8th Cir. 2018); *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997). The regulations place an affirmative duty on the ALJ to ask about any possible conflict between the vocational expert's evidence and the DOT, and to obtain an explanation for such conflict before relying on the expert's testimony to find that the plaintiff was not disabled. *Welsh v. Colvin*, 765 F.3d 926, 929 (8th Cir. 2014). An ALJ is required to obtain an opinion from the vocational expert regarding whether there is a reasonable explanation for an apparent conflict, and determine whether the expert's testimony was reliable notwithstanding the conflict. *Thomas*, 881 F.3d at 678.

A reasonable explanation may exist for why the vocational expert identified reasoning level 2 and 3 jobs as being suitable for an individual limited to jobs that required such person to only understand, remember, and

carry out simple instructions. The job requirement definitions in the DOT are generic maximums for each position, and as such, reliance on the DOT job requirement definitions as a definitive authority may be misplaced. *Moore v. Astrue,* 623 F.3d 599, 604 (8th Cir. 2010). For example, all jobs included within a particular occupation category may not have requirements identical to, or as rigorous as, the identified generic maximum. *Id.* An expert may have learned from experience obtained from placing workers, from conversations with employers, or from other reliable publications, that a particular job's requirements are not as severe as listed in the DOT. *Welsh,* 765 F.3d at 930. But when the conflict is apparent, and not merely possible, the ALJ must do more than merely have the expert affirm that his or her testimony was consistent with the DOT. *Thomas,* 881 F.3d at 678.

Here, there is no evidence in the record that the ALJ did anything more than have the vocational expert affirm that her testimony was consistent with the DOT. Filing 9-2 at 48. Additionally, in the ALJ's written findings and conclusions, she reported that she had determined that the vocational expert's testimony was consistent with the information contained in the DOT. Filing 9-2 at 20. However, the ALJ did not cite the evidence that she considered, or documents that she reviewed, or indicate in any way how she resolved the conflict between the vocational expert's testimony and the job requirement definitions in the DOT. It appears from the record as though the ALJ and vocational expert may have been unaware that a conflict even existed.

The Court finds that the administrative record reflects that the ALJ did not affirmatively inquire about the apparent conflict between the vocational expert's testimony and the job requirement definitions in the DOT. As such, the ALJ did not obtain a reasonable explanation for the conflict, so that the expert's testimony could be deemed reliable notwithstanding the conflict.

Based on the above, substantial evidence does not support the ALJ's determination that the plaintiff is not disabled. *See Stanton*, 899 F.3d at 558.

The Commissioner argues that there is no apparent conflict between the ALJ's residual functional capacity finding—that the plaintiff was suited for jobs that only required her to understand, remember, and carry out simple instructions—and the occupations identified by the vocational expert that were coded at reasoning level 2 and 3 in the DOT. Filing 16 at 7. The Commissioner relies on *Moore v. Astrue*, which, according to the Commissioner, holds that there is no direct conflict between a limitation of carrying out simple job instructions and reasoning level 2 occupations.

The Commissioner reads *Moore* to say more than what is actually said. In *Moore*, the court held that the ALJ could rely on the vocational expert's opinion because there was nothing in the record to suggest that the expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs. *Moore*, 623 F.3d at 604. In *Moore*, the vocational expert identified only reasoning level 2 jobs for the plaintiff. *Moore* does not stand for the proposition, as the Commissioner suggests, that there is no conflict between reasoning level 3 occupations, and occupations that only require a person to understand, remember and carry out simple instructions.

Here, the record suggests that the vocational expert and the ALJ were perhaps unaware, or possibly ignored, that two of the occupations the vocational expert identified were coded in the DOT at reasoning level three, and the third occupation was coded at reasoning level 2. Both reasoning levels describe, as generic maximums, an individual with the capacity to do more than understand, remember, and carry out simple instructions. At a minimum, reasoning level two, as a generic maximum, describes an individual capable of

28

applying a commonsense understanding to carry out detailed but uninvolved written or oral instructions.

Perhaps there is a subset of jobs in the occupations identified by the vocational expert that can be performed by a person limited to understanding, remembering, and carrying out simple instructions. But here, the absence of an explanation in the record resolving the conflict does not allow the ALJ to make that finding. Neither does the record allow the ALJ to find the number of jobs in the national economy that may exist in any such subset.

Conflicts between a vocational expert's opinion and classifications in the DOT, if not resolved, are generally held to be reversible error. *See Stanton*, 899 F.3d at 558-59 (8th Cir. 2018). The Court finds that the ALJ's conclusion that the plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy is not supported by substantial evidence on the record.

## 2. FINDINGS REGARDING THE PLAINTIFF'S CREDIBILITY

The ALJ found that the plaintiff's medically determinable impairments "could reasonably be expected to cause her alleged symptoms." The ALJ, however, also concluded the plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. Filing 9-2 at 15. The plaintiff argues that the ALJ failed to provide good reasons supported by substantial evidence in finding the plaintiff not to be credible. Filing 12 at 23-27. The plaintiff asserts that the "ALJ erred by playing doctor" while not taking into account the record as a whole, and by mischaracterizing the evidence regarding the plaintiff's activities. Filing 12 at 25.

Although the Court must defer to the ALJ's determinations regarding credibility so long as such determinations are supported by good reasons and

substantial evidence, *Boettcher*, 652 F.3d at 863, here, the Court agrees that the ALJ's findings regarding the plaintiff's activities are, to be generous, inaccurate. The ALJ reported that the plaintiff "acknowledges that she could maintain her own care, prepare simple meals, drive a car, shop for groceries, care for her children and take them to school, travel once a year, and help around the house with cleaning, laundry, and doing the dishes." Filing 9-2 at 17.

However, the 2017 daily activities report the ALJ cited in support of her findings paints a vastly different picture of the plaintiff's capabilities. The plaintiff reported that her "daily life consists mostly of sleeping and laying down." She will pick up her kids from school, come home and lay down. She takes frequent naps while doing household chores and usually does not complete those chores. Filing 9-6 at 36. She can take care of her day to day personal needs, but gets exhausted getting ready and has to sit frequently, and has to sit in the shower as she gets dizzy. She gets exhausted and has to take breaks doing laundry or loading the dishwasher. She sits while she cooks, and rests as needed. She grocery shops maybe one or two times a month, but only if she has to—her husband usually does it. Filing 9-6 at 37. When she does grocery shop, she has to have someone with her to help. It may take her ten to fifteen minutes to walk a couple blocks.

The plaintiff wrote "I can't stand without feeling like my heart is going to explode. I can't sit without my legs starting to hurt or feel numb and weak. My neck is constantly in pain and usually causes a headache. I can't think the way I use to. I can't concentrate or find the right thoughts or words when I'm talking to people." "On a good day," the plaintiff continued, "I have all my symptoms, but they aren't too bad. I can push through the pain and fatigue

and heart tachycardia and headaches to get things done. However, this always leads to a bad day or couple of days." Filing 9-6 at 38.

At the hearing in September 2018—which the ALJ also cited in support of her findings—the plaintiff said she when she drives her kids to school, she makes wrong turns and forgets how to get there. Filing 9-2 at 41. She has trouble getting up, and taking a shower. She sleeps most of the day. When she is laying down and sits up, she feels dizzy and lightheaded. If she doesn't wait to stand, she feels like she will faint. Filing 9-2 at 42. She is drenched with sweat and her heart is racing after doing laundry, and loading or unloading the dishwasher. Grocery shopping is really difficult, so now she has groceries delivered, and she has to have someone help unpack them. Filing 9-2 at 45. The plaintiff's description of her activities at the hearing was consistent with the account she gave to Roehrs at her functional capacity evaluation three days later. *See* filing 9-8 at 140.

Regarding the ALJ's reference to the plaintiff's capacity to travel, the record reflect that the plaintiff has traveled twice—once to a family wedding in Boston, and the other occasion was to attend a Marfan syndrome conference in Atlanta. Filing 9-2 at 46-47. The plaintiff, her husband, their daughter, and youngest son—who is also diagnosed with Marfan syndrome—attended the conference. The family drove to Atlanta, and once there, the plaintiff said they walked more than she usually walks due to a lack of transportation. She said they made many stops so that she could rest, and they waited until she could move again. Contrary to the ALJ's finding, the plaintiff did not acknowledge that she could travel once a year. Filing 9-2 at 17. The plaintiff testified that she and her family took a vacation maybe once a year *prior* to the occurrence of her symptoms. Filing 9-2 at 47. She said they would not have gone anywhere in 2018 expect for the family wedding in Boston. The ALJ's conclusions about

what the plaintiff acknowledged regarding her daily activities of living are not supported by substantial evidence.

Consistent with *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1998), when assessing a plaintiff's credibility regarding subjective complaints, an ALJ must consider the plaintiff's prior work history; daily activities; duration, frequency and intensity of symptoms; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999). Using the *Polaski* factors, a plaintiff's subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017).

Here, the Court finds that the plaintiff's subjective complains are consistent with, and supported by the reports of the plaintiff's several medical evaluations, the patient histories reported at her evaluations, and the medical providers' assessments, plans, and opinions. The ALJ's conclusions with respect to the plaintiff's medical evaluations tends to focus on examination findings that no physician correlates to the relevant symptoms affecting the plaintiff's capacity to work. For example, the ALJ noted that at her March 2016 evaluation with Dr. Franco, the plaintiff "demonstrated intact strength, coordination, and the ability to tandem walk." Filing 9-2 at 15. But the ALJ left out Dr. Franco's report that the plaintiff was struggling with neuropathic and musculoskeletal pain as well as fatigue, and that she was taking prescription medication for pain control and fatigue with only some benefit. Filing 9-7 at 58. Further, the dosage of Gabapentin Dr. Franco prescribed for the plaintiff's neuropathic pain was relatively high—900 mg three times daily—yet it provided only some benefit.

The ALJ noted again, that at the plaintiff's January 2017 examination with Dr. Zabad, her strength, sensation, and coordination remained full, and

also, that the plaintiff "indicated achievement of some degree of pain control." Filing 9-2 at 16. Like Dr. Franco, Dr. Zabad did not reference the plaintiff's strength, sensation, and coordination as evidence that the plaintiff's complaints were exaggerated or overstated, or that the symptoms associated with her diagnosed conditions had improved as evidence by her strength, sensation, or coordination. Instead, Dr. Zabad reported that with respect to the plaintiff's multiple sclerosis, she was reporting "some pain in her neck," and that "Gabapentin helps incompletely, but pain control is acceptable." Filing 9-7 at 159. Dr. Zabad reported that the plaintiff's Gabapentin dosage had been increased to 1,200 mg three times daily. Filing 9-7 at 160.

Dr. Zabad also reported, but the ALJ did not note, that the plaintiff's autonomic testing was abnormal and supported a diagnosis of POTS. Filing 9-7 at 158. Dr. Zabad noted that the plaintiff wore a heart monitor that demonstrated her heart rate increased to 120 upon standing, and with activity her heart rate increased further to 160 to 200. Dr. Zabad observed, this heart rate increase "wipes her out." Dr. Zabad's impression of the plaintiff's condition on this occasion included, clinically definite multiple sclerosis, significant fatigue, lightheadedness and dizziness due to POTS, and chronic neuropathic pain. Filing 9-7 at 162-63.

The plaintiff was examined by Dr. Zabad's Advance Practice Registered Nurse, Rebekkah Thomas, in May 2019. From the report of this examination, the ALJ only noted that the plaintiff related that she was feeling well, with no new neurological symptoms, but a slight worsening of her fatigue, mental fog, left-sided paresthesia, and neurological symptoms. The ALJ stated that on examination, the plaintiff had normal strength, sensation, and neurological findings, despite continued gait abnormalities and a slight tremor and motor delays of her left side.

33

The ALJ's findings fail to acknowledge that no new neurological symptoms necessarily means that the plaintiff's existing neurological symptoms were still present, and by the plaintiff's report, those symptoms had gotten slightly worse. In other words, this report does not represent an improvement in the plaintiff's condition, but a worsening. The plaintiff still suffered from relapsing remitting multiple sclerosis, with reports of neuropathic pain, left-sided paresthesia, and cognition difficulties. Filing 9-8 at 119. The plaintiff specifically reported that her cognitive difficulties had gotten more noticeable in the previous six months, with difficulty in verbalizing what she was thinking. Filing 9-8 at 116. The plaintiff's neuropathic pain symptoms were ongoing, and only partially benefited from the maximum dosage of Gabapentin. Filing 9-8 at 135. The plaintiff's chronic fatigue was also ongoing, and likely exacerbated by one of the most common side effects of Gabapentin—sedation. A patient's history, or reports of subjective complaints, is an essential diagnostic tool, and a physician must necessarily rely on a patient's description of their subjective complaints. *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997).

The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." *Combs*, 878 F.3d at 646. Here, there is an abundance of medical and non-medical evidence that detracts from the ALJ's decision to deny disability. The bulk of the plaintiff's medical evaluations were performed by physicians associated with the University of Nebraska Medical Center who specialized in the plaintiff's conditions. Those physicians consistently reported that the plaintiff's diagnosis and symptoms were verified by objective testing and studies, and that her symptoms were consistent with her diagnosed conditions. Importantly, no physician considered that the factors the ALJ seemed to focus

on—strength, sensation, and coordination—had any relevance to the objectively verified conditions afflicting the plaintiff. A comment in a medical record that a claimant was doing well for the purposes of treatment "has no necessary relation to a claimant's ability to work or to [her] work-related functional capacity." *Nowling v. Colvin,* 813 F.3d 1110, 1123 (8th Cir. 2016). Appearing to be in a good or normal mood for the purposes of a treatment program has little or no necessary relation to a plaintiff's ability to work, or to work-related functions. *Hutsell v. Massanari,* 259 F.3d 707, 712 (8th Cir. 2001).

The plaintiff argues that because the ALJ found that the plaintiff's statements regarding intensity, persistence, and the limiting effects of her symptoms were not entirely consistent with the record, the ALJ's residual functional capacity determination failed to include an allowance for absences from work, or account for the extent that the plaintiff may be off-task in a given workday. These allowances were necessary to account for the plaintiff's chronic fatigue. The Court agrees. The ALJ's residual functional capacity determination appears to associate the plaintiff's well-documented significant chronic fatigue only with her ability to perform detailed or complex tasks. Filing 9-2 at 19. The Court finds that there is substantial evidence that the plaintiff's chronic fatigue imposes limitations on the extent to which the plaintiff could be expected to perform work in a competitive labor market on a consistent basis.

Prior to the onset of her symptoms, the plaintiff had been employed in a responsible position, earning a decent salary, and according to the plaintiff, she had a great job that she worked hard at, but her illnesses made consistent work impossible. Filing 9-2 at 37; filing 9-6 at 23. There is no evidence in this record suggesting that the plaintiff's work history prior to the onset of her symptoms was unsatisfactory. An unimpressive work record can discredit

35

subjective complaints of pain, but here, no such unimpressive work record, or even the suggestion of such record, exists. *See Singh v. Apfel,* 222 F.3d 448, 453 (8th Cir. 2000).

A plaintiff's medical condition and the nature of life activities should be considered against the backdrop of the capacity to perform in the competitive labor market. *See Nowling,* 813 F.3d at 1122. A disability inquiry must focus on the claimant's ability "to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Tang v. Apfel,* 205 F.3d 1084, 1086 (8th Cir. 2000). A plaintiff's residual functional capacity is determined based on all relevant evidence; including the medical records, observations of treating physicians and others, and the plaintiff's own descriptions of her limitations. *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir. 2004). Further, a plaintiff's residual functional capacity is a medical question, and requires medical evidence indicating such plaintiff's capacity to function in the workplace." *Mabry v. Colvin,* 815 F.3d 386, 390 (8th Cir. 2015); *Brown v. Barnhart,* 390 F.3d 535, 539 (8th Cir. 2004). An ALJ may not simply draw her own inferences about a plaintiff's functional capacity or limitations from the medical reports. *Combs,* 878 F.3d at 646.

The Court finds that good reasons and substantial evidence do not support the ALJ's conclusion that the plaintiff's statements concerning the intensity, persistence, and the limiting effects of her symptoms are not entirely consistent with the medical and other evidence in the record. *Boettcher,* 652 F.3d at 863. Further, the Court finds that the ALJ's residual functional capacity finding fails to account for the plaintiff's significant fatigue, and its effect on the plaintiff's ability "to perform the requisite physical acts day in and

day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Tang,* 205 F.3d at 1086.

Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical. *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005). Hypothetical questions must include "all the claimant's impairments supported by substantial evidence in the record as a whole." *Id.*; *Swope v. Barnhart*, 436 F.3d 1023, 1025 (8th Cir. 2006). Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments. *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).

The Court observes that at the hearing, the ALJ and plaintiff's counsel asked the vocational expert to opine whether the hypothetical individual would be able to perform the jobs she identified if such person missed work on an unscheduled basis two time per month, or if such person were required to rest one hour per day. The vocational expert answered no to each scenario. Filing 9-2 at 48-49. Further, the vocational expert acknowledged that a person who needed to rest one hour per day would not be able to perform any competitive employment. Filing 9-2 at 48. When asked to explain her opinion, the vocational expert said, "anything that exceeds off task time of more than five or six minutes an hour is not going to be tolerated in competitive employment." Filing 9-2 at 49. Whether the plaintiff's need for off task time relief falls within, or outside of, the vocational expert's opinion is a matter for the ALJ to consider in the first instance on remand.

37

### 3. The Weight Accorded to Medical Source Opinions

The plaintiff argues that the ALJ did not provide good reasons or a sufficient explanation for the weight she assigned to the opinions of Rebekkah Thomas and Tammy Roehrs. Filing 12 at 28. The ALJ reported giving partial weight to the opinions of both providers. Filing 9-2 at 17-18. The Commissioner argues that the weight assigned to the providers' opinions was properly within the ALJ's discretion and zone of choice. Filing 16 at 13.

The Commissioner claims that neither Thomas or Roehrs is an "acceptable medical source" and their opinions are not entitled to any particular or special weight. *Id*. But regardless, the pertinent regulations required the ALJ to consider all medical opinions in the record together with the rest of the relevant evidence. 20 C.F.R. § 404.1527(b). Further, the pertinent regulations require the ALJ to give good reasons for the weight assigned to a treating source's[5] medical opinion, as well as the opinion of a medical source who is not defined as an acceptable medical source. 20 C.F.R. § 404.1527(c)(2) & (f)(2).

The plaintiff argues that the ALJ failed to give good reason for her treatment of two of Thomas' opinions, both of which concerned the plaintiff's capacity to work. Filing 12 at 28-29. First, Thomas identified that the plaintiff's chronic fatigue is a multifactorial condition complicated by her diagnosis of multiple sclerosis, POTS, restless leg syndrome, and obstructive sleep apnea, and exacerbated by heat sensitivity, physical activity, and the high dosage of prescription medication she takes for chronic neuropathic pain. Thomas then opined that the plaintiff would benefit from a rest period of one hour per day

---

[5] A treating source is defined as a claimant's own acceptable medical source who provides, or has provided, medical treatments or evaluations, and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1527(a)(2).

to alleviate her fatigue. Filing 9-8 at 150. Second, Thomas opined that due to the unpredictable nature of the plaintiff's relapsing remitting multiple sclerosis, it is likely that the plaintiff would have to miss two or more days of work in a month.

The ALJ disregarded Thomas' first opinion, claiming that she "did not opine that the claimant would need an additional rest break outside of normal work breaks." Filing 9-2 at 17. The ALJ disregarded Thomas's second opinion, claiming she "did not adequately explain the claimant's need for two or more absences per month." *Id.* The ALJ concluded that the medical evidence shows that the plaintiff often reported doing well and responded to medications, objective testing suggested stability of the plaintiff's disease, and the plaintiff's extensive activities of daily living suggests she can engage in activities beyond that described by Thomas.

The Court finds that good reasons and substantial evidence do not support the ALJ's decision to disregard Thomas' opinions regarding the plaintiff's capacity to engage in competitive work. The ALJ's interpretation of Thomas' opinion regarding one hour of rest is . . not consistent with the record. Thomas wrote that the plaintiff "can benefit from a rest period of one hour a day to alleviate her fatigue." A fair understanding of Thomas' opinion would be that the plaintiff required one hour of rest in addition to any rest breaks normally allowed during the course of a workday. Certainly, Thomas did not opine that the rest breaks normally allowed during the course of a normal workday would be sufficient to alleviate the plaintiff's fatigue. The ALJ's interpretation of Thomas' opinion is not supported by the record. Also, if the ALJ believed that Thomas' explanation for why the plaintiff may miss two or more days of work per month was incomplete, ambiguous, or unclear, it was her duty to inquire further and supplement the record. The ALJ undeniably

has the duty to fully and fairly develop the record, independent of the plaintiff's burden to press her case. *Combs*, 878 F.3d at 646.

Finally, the ALJ's summarization of the evidence indicating that the plaintiff can engage in activity beyond that described by Thomas is not supported by substantial evidence and good reasons. Whether the plaintiff told her doctor she was doing well or not is of little relevance. Appearing to be in a good or normal mood for the purposes of a treatment program has little or no necessary relation to a plaintiff's ability to work, or to work-related functions. *Hutsell*, 259 F.3d at 712. Contrary to the ALJ's finding, the medical records and evidence show that, at best, the plaintiff received only partial benefit from prescription medication. *See e.g.* Filing 9-7 at 159-60 (reporting Gabapentin, at the maximum dosage, helps incompletely but pain control is acceptable).

The stability of her disease as shown by objective testing isn't evidence that the plaintiff is capable of more as the ALJ opined. Instead, it is evidence showing how intractable the plaintiff's symptoms actually are. And, the plaintiff's activities of daily living cannot objectively be characterized as "extensive." She reports an inability to complete routine household tasks without help, and the medical evidence in this record substantially supports her claims. Again, an ALJ may not draw her own inferences about a plaintiff's functional capacity or limitations solely from the medical reports. *See Combs*, 878 F.3d at 646.

The Commissioner is correct that Roehrs is not an "acceptable medical source" as defined in the regulations. 20 C.F.R. § 404.1502(a)(1)-(8). She is, however, a source of highly relevant medical information. Regardless of Roehrs' or any medical source's characterization, an ALJ is required to evaluate every medical opinion in evidence. 20 C.F.R. § 404.1502(c). One factor in evaluating the opinion of a medical source is whether the medical source is

a specialist, and the opinion is related to the source's specialty. 20 C.F.R. § 404.1502(c)(5). Here, Roehrs is a physical therapist, and credentialed with a Neurologic Specialist Certification. Filing 9-8 at 139.

Over two days, Roehrs conducted a functional capacity evaluation, which was modified to better understand the impact of multiple sclerosis on the plaintiff's functional ability. *Id*. The ALJ essentially ignored Roehrs' interpretation of her findings when she evaluated Roehrs' opinions regarding the plaintiff's capacity to function. The ALJ reasoned that Roehrs' findings regarding limitations to the plaintiff's employability and ability to return to prior work, address issues strictly reserved to the Commissioner. Filing 9-2 at 18. The Court disagrees with the ALJ's conclusion. The ultimate issue of whether a claimant meets the statutory definition of disabled is reserved to the Commissioner. 20 C.F.R. § 404.1502(d)(1). But an ALJ must consider evidence and opinions from medical sources to determine issues such as a claimant's residual functional capacity, and the application of vocational factors, even though the final responsibility for deciding these issues is reserved to the Commissioner. 20 C.F.R. § 404.1502(d)(2).

Roehrs' findings and conclusions are evidence and opinions from a medical source that should ordinarily be considered by an ALJ in determining a claimant's residual functional capacity, or in the application of vocational factors. Here, Roehrs found that multiple sclerosis, Marfan syndrome and POTS all contributed to observed balance deficits, elevated heart rate, and elevated blood pressure with minimal exertion. Filing 9-8 at 145. These deficits, Roehrs opined, make any job beyond light duty unrealistic, and the plaintiff's labile blood pressure and heart rate make it unlikely she could pass a pre-employment physical. Further, Roehrs found that the frequent rest breaks the plaintiff required to manage her blood pressure and heart rate

concerns make it unlikely that she could meet the productivity expectations of an employer. Finally, Roehrs believed that the plaintiff's level of fatigue prevented her from returning to her past employment as an auditor, and made it difficult for her to complete training for an alternate vocation.

The ALJ failed to provide good reasons or identified substantial evidence that would allow her to assign only partial weight to Thomas and Roehrs' findings and opinions.

## III. CONCLUSION

The ALJ's denial of benefits is not supported by substantial evidence on the record as a whole. This matter is remanded for further proceedings consistent with this Memorandum and Order.

IT IS ORDERED:

1.    The plaintiff's motion for reversal of the Commissioner's final decision (filing 11) is granted.

2.    The Commissioner's motion to affirm the Commissioner's final decision (filing 15) is denied.

3.    The Commissioner's decision is reversed.

4.    This matter is remanded back to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Court's Memorandum and Order.

5.    A separate judgment will be entered.

Dated this 16 day of April, 2021.

BY THE COURT:

John M. Gerrard
Chief United States District Judge